PETTIGREW, J.
|2In this medical malpractice action, the defendant, the State of Louisiana through the Louisiana State University Board of Supervisors, The Louisiana State University Health Sciences Center, Earl K. Long Medical Center (hereinafter, collectively referred to as “defendant” or “EKL”) appeals a judgment rendered against it based on a jury verdict finding that the internal medicine physicians and staff, as well as the general hospital administrative staff at Earl K. Long Medical Center, breached the established applicable standard of care, and that those breaches caused damages and the ultimate death of fifty-one-year-old Amy Kirby. After a thorough review of the record, we find no merit to the defendant’s assignments of error, and affirm the judgment. Likewise, we find no merit in the plaintiffs’ answer to the appeal, seeking damages for a frivolous appeal, and decline to render an award.
SUMMARY OF BACKGROUND FACTS AND PROCEDURAL HISTORY
On December 19, 1993, Ms. Kirby married the plaintiff, John Kirby, and together they had a child, plaintiff Jonathan Kirby. Ms. Kirby also had three children from a prior marriage, plaintiffs Michelle C. Norton, William Andrew Cuny, and Angela Renee Cuny. In 1994, Ms. Kirby graduated as a registered nurse from Our Lady of the Lake School of Nursing. She worked at the OLOL Medical Center in the Neurology Department, and then later worked as a home health nurse. She was forced to retire due to a back injury sustained in a 1999 automobile accident, for which she took opioid medications. Although Mr. Kirby was employed at Superior Ford, the family had personal financial difficulties and had lost its medical insurance coverage.
Ms. Kirby died at EKL on August 7, 2008, two days after being admitted for continued complaints of severe and worsening abdominal pain and constipation, for which she had previously made several recent trips to the emergency room (ER) at EKL. The medical occurrences that led up to Ms. Kirby’s death were a perforated colon at the | ¡¡cecum that allowed liquid stool into her abdominal cavity, after which she became septic, and developed DIC[1] and metabolic acidosis.
The record reveals that throughout the two days leading up to her death, Ms. Kirby screamed in agony that she was rupturing from the inside, felt that she was dying, and pleaded with the EKL staff to do surgery, or something, to relieve her of the unrelenting and unbearable pressure and pain in her abdomen. Instead, the EKL staff continued the same treatment it had administered from the inception of her complaints — administering increasingly strong laxatives, enemas, and pain medication. And indeed, as she predicted, Ms. *4 Kirby’s colon ruptured and as a result she ultimately died.
The record also reveals that there were other tests available that were not performed, specifically, a CT of the abdomen, a colonoscopy, and/or a hy-paque/gastrografin enema, through which the EKL physicians would have been able to diagnose Ms. Kirby’s malfunctioning bowel, and decompress her expanding colon before it ruptured. Further, the record evidences that the interns and residents attending to Ms. Kirby, including them supervisors, failed to timely or adequately address Ms. Kirby’s agonizing screams due to her symptoms or modify the treatment she was being given despite that the treatment showed no signs of improving her symptoms or her condition.
EKL appeals the judgment adopting the jury verdict, which was consistent with a prior medical review panel opinion, concluding that the administrative staff and internal medicine physicians at EKL breached the standard of care owed to Ms. Kirby and that those breaches caused her injuries and death.[2] The jury awarded damages in excess of $1,750,000.00, which were reduced to the medical malpractice cap of $500,000.00. The defendant did not assign error to the damage award; it is not at issue in this appeal.
^SPECIFIC FACTUAL BACKGROUND
Approximately three weeks prior to her death, Ms. Kirby was hospitalized at Lane Memorial Hospital (Lane), from July 15, 2008 to July 17, 2008, for tests and evaluation of complaints of abdominal pain and weight loss. An abdominal CT scan performed at Lane reveáled a pancreatic mass and a nearby lymph node was indicative of metastasizing pancreatic cancer. She was released from Lane on July 17, with the continued prescribed use of oxycodone for pain and with instructions to report for follow-up treatment at EKL’s Hematology/Oncology Clinic.
Ms. Kirby reported to the EKL clinic on the date of her appointment, July 24, 2008, but was told she did not have one scheduled. However, on that date, she did see a nurse practitioner who ordered some lab work and also scheduled appointments for Ms. Kirby to return to biopsy, confirm, and stage her pancreatic cancer.
However, prior to those appointments, on July 30, 2008, Ms. Kirby went to the EKL ER complaining of pain to her back, stomach, and ribs. An abdominal examination at this time revealed diffuse abdominal pain, with bowel sounds present. She reported that her last bowel movement had been the day before. Her prior lab tests indicative of cancer were confirmed; her previously scheduled appointments were confirmed and moved up to August 6, 2008; and she was discharged that same day with additional pain medication.
The next day, July 31, -2008, Ms. Kirby reported to the ER at Lane with the same complaints of ■continuing abdominal pain, now radiating to her back. An abdominal x-ray was performed that revealed scattered gas within her small and large intestines, but no evidence of acute intra-ab-dominal problems. She was administered additional narcotic medication and discharged that same day.
The following day, August 1, 2008, Ms. Kirby was still in severe abdominal distress and EMS was called to her’ home. The EMS reports reflect that she complained of pain in the left upper quadrant *5 of her abdomen, radiating into her mid-back. She was transported to EKL where she complained of increasing and worsening abdominal pain despite taking morphine and oxycodone. She was admitted to the hospital for observation and pain medication regulation. She was started on a fentanyl patch for the 1 ^breakthrough pain, which Ms. Kirby reported helped control her pain much better than anything had before. X-rays of her abdomen were performed that revealed,“a moderate degree of retained stool throughout the colon.” She was diagnosed with refractory narcotic-induced constipation and was placed on a bowel regimen of laxatives and stool softeners. She was discharged at approximately 3:00 p.m. on August 2, 2008, despite that she was unable to have a bowel movement while at the hospital.
However, at 10:49 p.m. that same day, EMS was again called to her home, and the responders found Ms. Kirby in a fetal position, complaining of increasing pain for the past six hours that was getting worse. She was transported back to the EKL ER, and records indicate she complained of “periumbilical” (around the belly button) abdominal pain and reported that she had not had a bowel movement in three days. She was examined again, and her abdomen was noted to be firm, distended, and tender to palpation. An x-ray revealed that she had, a large amount of retained stool in her ascending colon (indicating that.the stool was not moving as it should through the colon), but no free air, or evidence of a small bowel obstruction. After having a “small” bowel movement while in the ER, she was discharged early in the morning on August 3, 2008, with instructions to take a stool softener and a stronger laxative and to report to the Oncology Department within twenty-four hours for pain management and constipation side effects.
' However, at approximately 7:30 p.m. the next day, August 4, 2008, Ms. Kirby again returned to the EKL ER with the same, continued, but worsening abdominal pain complaints and stating that she had not had a bowel movement in six days. She was triaged, -x-rayed, ■ and admitted to the hospital at approximately-10:30 p.m., with a diagnosis of constipation secondary to pain medications.[3] A physical examination revealed her abdomen was distended and tender to palpation, with diffuse abdominal pain. She was given fluids, multiple doses of laxatives, stool softeners, and enemas (soap-| fisuds and mineral oil), none of which produced a successful bowel movement. She was also given continued and increased morphine for her pain, and valium to calm her down.
In the early morning hours of August 5, 2008, after experiencing continued and increased pain with the additional laxative/enema efforts, Ms. Kirby refused another enema, stating she could not endure the pain. At this time, the nurse summoned the medical team to Ms. Kirby’s room. Dr. Davey Prout, a first-year intern,’ and his supervising second-year resident, Dr. Oleana Lamendola, came to Ms. Kirby’s bedside. They ordered a portable x-ray that revealed a moderate amount of stool in Ms. Kirby’s colon, but no apparent obstruction. Ms. Kirby began vomiting yellow liquid and stating that she felt that “she was exploding inside.” Ms. Kirby was given ativan for agitation, and additional doses of oral laxatives (magnesium citrate). She rested for a short period of time; however, at approximately 7:00 a.m., she, again, was in extreme distress, crawling on the floor and screaming that she *6 was “rupturing” inside and was “dying.” She began vomiting again, this time, a pink liquid, and a physician was paged due to the attending nurse’s concern that the vomit may be blood. A second-year resident, Dr. Anne Price, came to Ms. Kirby’s bedside and examined her: abdomen, noting that it was “soft, but tender.” She also noted that Ms. Kirby’s abdomen appeared distended, somewhat hard, with no bowel sounds. Dr. Price ordered the placement of an NG tube, and also called for a surgical consult, (Ms. Kirby’s daughter, Michelle Norton, whose complete testimony is discussed in more detail below, testified that by this time her mother was pale, her breathing was rapid and shallow and. her mental state had changed dramatically; she was going in and out of lucidity and not able to carry on a meaningful conversation.)
At approximately 7:45 a.m., at the insistence of Ms. Norton, Dr. Price summoned a surgical consult. Fifth-year resident surgeon, Dr. Mark Dominguez, evaluated Ms. Kirby, together with Dr. Lamendola. Dr. Dominguez noted that Ms. Kirby had a diagnosis of a pancreatic head mass, but that she had been readmitted to the hospital with abdominal pain. He also noted that she stated she had not had a bowel movement in seven days, and that this was “secondary to opiate use” He observed that Ms. Kirby was |7“uncomfortable” and that she stated she wanted them to “get out the stool.” Notwithstanding, Dr. Dominguez declined to operate, instead ordering continuing serial abdomen exams and enemas for bowel movement.
Medical records also indicate that at 8:00 a.m., Ms. Kirby was seen by first-year ICU resident Dr. Jason Toups, who, without performing a physical examination, ordered yet more laxatives and mineral oil, together with a bolus of saline, in continued attempts to force Ms. Kirby to have a bowel movement.
According to the testimony of Ms. Kirby’s daughter, Ms. Norton, who was with her mother from the time she was brought to the emergency room at EKL on August 4, 2008, the entire time they were waiting in the emergency room, her mother complained of severe pain in her abdomen, which Ms. Norton testified was firm, distended, and bloated. She stated that she still had not had a bowel movement and felt that she needed to have one. Ms. Norton testified that her mother told that to everyone she came into contact with in the emergency room. In fact, Ms. Norton divulged that her mother, as a registered nurse, had a patient years before that had died from a perforated bowel; and her mother told her as well as EKL staff members, “[s]he was scared to death to perforate.”
Also, according to Ms. Norton, her mother continued to get up and get on the toilet and “strain and strain” in attempts to relieve her symptoms and have a bowel movement. Ms. Norton testified that despite her mother’s symptoms getting worse, instead of better, the staff continued to give her mother more morphine for her pain, and more laxatives, which only caused Ms. Kirby to suffer even more pain and still failed to produce a bowel movement. Ms. Norton stated that her mother’s pain was so great that While the nurse was administering the enema, her mother was screaming in agony and asking her to stop. Ms. Kirby noted to the nurse that she felt that the enema was only “pushing everything that was in her in further.” Eventually, Ms. Kirby got off of her hospital bed, and writhing in pain, rocked back and forth on her hands and knees on the hospital room floor, screaming “that she felt like she was rupturing inside and she wanted someone to help her.”
*7 |sMs. Norton also observed that her. mother’s belly was increasing in size and that in one day’s time, she went from having a “baby bump” to “looking like she was eight months pregnant.” Also, according to Ms, Norton, her mother was straining so badly ⅛ attempts to have a bowel movement in her bed, her bladder and rectum prolapsed and were actually coming through her vagina. Ms. Norton proclaimed the doctor had to push the organs back into her mother’s body. At this point, Ms, Norton stated that she started demanding a surgical consultation, as she was convinced her mother needed surgery to relieve her bowel. When the surgeon, Dr. Dominguez, arrived, Ms. Kirby was again, crawling on the hospital room floor, screaming and moaning in pain. Ms. Norton admitted that she was very frustrated and demanded that the surgeon cut her mother open and “get the shit out of her.” Despite her demands, she, stated that Dr. Dominguez merely tapped her mother on her belly, walked off to the side, whispering something to Dr. Lamendola, and then both doctors left the room, no more than “five to eight minutes” after entering the room.
According to Ms. Norton, shortly thereafter, her mother was started on an “anti-psychotic” medication, and Ms. Norton felt they were just trying to shut her mother up, so her agitation and screams of pain would not bother them or the other patients. Ms. Norton testified that her mother calmed down a bit with the anti-anxiety medications, and Ms. Kirby’s husband, John Kirby, as well as Ms. Norton’s aunt came to visit.
During this visit, the EKL internal medicine staff attending physician assigned to Ms. Kirby, Dr. Angela Johnson, came to the room. As Dr. Johnson was explaining the treatment plan (consisting of more laxatives and enemas), Ms. Norton noticed her mother had slumped over and had stopped breathing. She testified that she alerted Dr. Johnson as to her mother’s condition, at which time, a code was called. A crash cart and the Rapid Response Team arrived; and she, Mr. Kirby, and her aunt were escorted out of the room. Her mother was intubated and transported to the ICU. Dr. Dominguez saw Ms. Kirby in the ICU, at which time, she was rushed to surgery for an emergency exploratory laparotomy.
|<)Ms. Norton next saw her mother in the ICU, following the emergency surgery. She was told by Dr. Dominguez and “another doctor” that her mother’s bowels had been paralyzed, or had become “dead tissue,” that “she had ruptured” and a significant portion of her colon (35 cm) had been removed. She would be on a colostomy bag. for the rest of her life. According to Ms. Norton, she was told her mother’s prognosis was “grim,” and the medical plan was to keep her in a medically induced coma (on a ventilator) so that she wouldn’t be in so much pain.
However, a short time later, the staff approached her and Mr. Kirby and told them that Ms. Kirby’s condition had worsened and she was “bleeding from every organ.” They were asked if they wanted her to continue on the ventilator. When the family declined, Ms. Kirby was disconnected from all life support measures; the family went to see her, and she died shortly thereafter, at 4:27 a.m. on August 7, 2008. '
ASSIGNMENTS OF ERROR
EKL appeals the jury’s verdict as to the findings that both the administrative staff and the internal medical physicians at the hospital breached the, standard of care owed to Ms. Kirby. EKL argues that these findings are not reasonably supported by the factual and medical expert *8 opinion testimonial evidence in the record. EKL also assigns- error to certain statements made by the trial judge during voir dire regarding the merits of plaintiffs’ case, asserting the verdict may have been “incurably tainted” by the ’comments, which were prejudicial to the defendant, and warranted a mistrial. For the following reasons, we find these assignments of error lack merit.
BREACH OF THE STANDARD OF CARE
Standard of Review
Appellate review of a trial court’s findings in a medical malpractice action is limited. Johnson v. Morehouse General Hospital, 10-0387 (La.5/10/11), 63 So.3d 87, 96. It is well settled that a court of appeal may not set aside a jury’s finding of fact in the absence of manifest error or unless it is- clearly wrong, and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own evaluations and inferences are "reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).10 In reviewing a fact ■ finder’s factual conclusions, an appellate court must satisfy a two-step- process based on the record as a whole: there must be no reasonable factual basis for the trial court’s conclusion, and the finding must be' clearly wrong. Kaiser v. Hardin, 06-2092 (La.4/11/07), 953 So.2d 802, 810.
Discussion and Analysis
Accordingly, we must determine whether the record before us provides a reasonable factual basis for the jury’s factual finding that EKL’s administrative staff and the internal medicine physicians and staff breached the standard of care owed to Ms. Kirby.- We have thoroughly reviewed the record and as discussed below, find that it contains an adequate and reasonable basis for the jury’s factual conclusions and its verdict and that those findings are not clearly wrong-
Pursuant to La. R.S. 9:2794, a medical malpractice claimant must establish by a preponderance of the evidence: (1) the defendant’s standard' of care; (2) the defendant’s breach of that standard of care; and (3) a causal connection between the breach and the claimant’s injuries. Pfiffner v. Correa, 94-924 (La.10/17/94), 643 So.2d 1228, 1233.
Breach of Standard of Care by Hospital Administrative Staff
 A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient’s condition may require. It is the hospital’s duty to protect the patient from dangers that may result from- the -patient’s physical and mental incapacity as well-as from external circumstances peculiarly within the hospital’s control. Further, a hospital has a duty to provide and maintain adequate facilities and supplies and a competent staff so as to provide competent care to its patients. Armand v. State, Dept. of Health and Human Resources, 97-2958 (La.App. 1 Cir. 2/23/99), 729 So.2d 1085, 1088, writ denied, 99-0842 (La.5/14/99); 741 So.2d 661; Sibley v. Board of Supervisors of Louisiana State University, 490 So.2d 307, 311 (La.App. 1 Cir.), writ denied, 496 So.2d 325 (La.1986).
The record established that EKL is a state-operated teaching hospital, structured similarly to other state-operated teaching hospitals in the country. The EKL staff consisted of internal medicine “teams” that included interns, residents, and a staff Ifi“attending” physician, which were assigned responsibilities for the treatment of patients at different times. Relevant to Ms. Kirby’s care, there was *9 Medical Team D, which included Dr. Johnson, as the attending staff physician; Dr. Ann Long, a resident; and Dr. Miranda Mitchell, a first-year intern. Also treating Ms. Kirby was Medical Team C, which included Dr. Lamendola, a second-year resident; and Dr. Prout, a first-year intern. According to EKL, Medical Team C also had an attending staff physician; however, nothing in the record, the testimony nor medical records evidence, established the identity or the involvement of any such attending'physician in. relation to the care given to Ms. Kirby while at EKL.
The record also reveals that during- her most critical time of need, Medical Team C was in charge of Ms. Kirby from the evening hours of August 4, 2008 through 7:00 a.m. on August 5; at which time, Medical Team D was supposed to take over her care. However, inexplicably, during Ms. Kirby’s time of need, in the early morning hours of August 5, 2008, until shortly before her bowel ruptured around 9:20 a.m., no one from Medical Team D attended to Ms. Kirby. Indeed, it appears that during this time, she was seen instead by Dr. Toups, an ICU intern, presumably filling in for the absent Medical Team D staff. The record also reveals that Ms., Kirby was not examined by any staff physician at EKL between the period of time that she was examined in the ER on the night of August 4, 2008, and shortly before her bowel ruptured the following morning, around 9:20 a.m., despite the abundant documentation of her rapidly worsening condition and the screams of agony and pain. Also, as noted earlier, an x-ray taken during Ms. Kirby’s most critical state was inexplicably missing and could not be presented as evidence.
On August 5, 2008, when Ms. Kirby, slumped over in her bed and appeared to have quit breathing, a code (Rapid Response Team) was called and a crash cart was brought into her room. The evidence revealed that the EKG machine on that crash cart was not functioning properly, and the cart did not have the right size endotracheal tube. By the time Ms. Kirby was intubated and taken to ICU, she was in “critical” condition. After the surgery, her family was told that she had not been having bowel movements and she 112ruptured, because a large part of her colon (35 cm.) was paralyzed as a result of necrosis (had become dead tissue), which part had to be removed. Had Ms. Kirby survived, she would have, been on a colostomy bag for the rest of her life.
Finally, the medical review panel findings ware also entered into evidence. Although not conclusive, it is statutorily admissible as evidence to support or oppose any medical malpractice suit. La. R.S. 40:1299.39.1(H). As the trier of fact) the jury is free to accept or reject any portion or all of the opinion. McGlothlin v. Christus St. Patrick Hospital, 2010-2775 (La.7/1/11), 65 So.3d 1218, 1227. The panel opined that the defendant failed to meet the applicable standard of care and that the complained of conduct was a factor in the resultant damages. The panel’s findings submitted to the jury included the following:
The patient had evidence of chronic constipation as seen on x-rays at ALKMC and the medical record. CT scan would have made no differencé with this patient. The patient should not have continued ' to be prescribed oral laxatives which probably contributed to her colon perforation. GI consultation for possible colonoscopy, retention enemas, and/or hypaque enema performed timely might have avoided the perforation.
(Emphasis added.) Even without the other supporting evidence discussed above, the unanimous medical review panel opinion would have been a reasonable basis to *10 support the jury’s verdict that the hospital administrative staff at EKL breached the standard of care owed to Ms. Kirby and that breach caused the resultant damages leading to her tragic death. However, this record also supplies a reasonable foundation for the jury’s findings because there was evidence that EKL was not competently staffed (no identifiable attending staff physician, and insufficient supervision of interns and residents), nor properly supplied in its treatment of Ms. Kirby. Both of these deficiencies were also in violation of EKL’s own bylaws, which were also introduced into evidence.
Breach of Standard of Care by Internal Medicine Physicians and Staff
Our review of the record also reveals an abundance of evidence providing a reasonable factual basis for the jury’s verdict and establishes that the jury’s findings were not clearly wrong. The medical review panel opinion discussed above insofar as it supports the jury’s finding of a breach of the standard of care by the hospital | ^administrative staff, also supports the jury’s finding that the internal medicine physicians and staff breached the standard of care owed to Ms. Kirby, and that breach caused her damages and, ultimately, death. In addition to the medical review panel opinion, the record contains the following evidence also rendering the jury’s verdict sufficiently supported and not clearly wrong.
Plaintiffs presented two medical experts, Dr. Michael Apstein, a gastroenterologist, and Dr. Daniel Feingold, a colorectal surgeon, who both opined that Ms. Kirby died because the internal medicine doctors at EKL administered repeated doses of strong oral laxatives and enemas, which acted like pressurizing agents, since her bowel was apparently malfunctioning. The experts also agreed, that the internal doctors at EKL breached the standard of care in that they continued to administer the same treatment plan despite an increase and worsening of Ms. Kirby’s condition, In response thereto. They both testified that the doctors’ failures to stop doing what they had been doing over and over for days, with no progress or lessening of symptoms, was below the standard of care. Instead, the standard of care required the doctors to discontinue oral laxatives and enemas (instead of increasing the use thereof) and acquire a CT scan, which would have been useful in ruling out a mechanical obstruction, which, in turn, would have led to a course of treatment such as a colonoscopy, to relieve the pressure in her colon. They also opined that a gastroenterologist and/or surgeon should have been consulted much earlier than when Dr. Dominguez was called in.
To the extent that the EKL doctors may have attributed her symptoms to the pancreatic mass, both experts also opined this was a breach in the standard of care. According to both experts, the small pancreatic mass did not explain Ms. Kirby’s abdominal pain, which was diffuse and hot localized to the area where the mass was located. Additionally, both experts also agreed that at some point during which Ms. Kirby’s symptoms were worsening, instead of improving, with the treatment | umodalities employed she should have also been made NPO[4] (nothing by mouth), to prevent the increasing pressure in her colon.
Dr. Feingold opined that in addition to the breaches of the standard of care during August 4 and 5, the EKL doctors breached the standard of care owed to Ms. *11 Kirby during her prior admission on August 1 and 2. According to. Dr. Feingold, the treatment consisting of oral laxatives should have been stopped during that admission, and Ms. Kirby should not have been released from the hospital without having had a bowel movement, and without the doctors performing other tests to narrow down and properly diagnose her rapidly worsening abdominal pain. He also stated that the quality of the EKL x-rays was poor and did not adequately rule out an obstruction, which would have indicated that additional testing would be necessary to properly diagnose Ms. Kirby’s condition. While Dr. Apstein did not necessarily agree with Dr. Feingold’s opinion that the standard of care had been breached during Ms. Kirby’s first admission to EKL, both doctors agreed the standard of care was breached during her second admission. EKL suggests that because both experts did not agree, then the jury’s verdict relying on their testimony was in error. However, there is no legal basis for EKL’s argument that the plaintiffs’ experts must agree on all points of their assessment in order for the jury’s reliance on their testimony to be reasonable.
Actually, when the expert witnesses present differing testimony, it is the function and responsibility of the trier of fact to determine which evidence to believe, and that finding can virtually never be manifestly erroneous. Washington v. Waring, 2013-0078 (La.App. 1 Cir. 2/18/14), 142 So.3d 40, 46, writ denied, 2014-0515 (La.4/25/14), 138 So.3d 646. This well established law applied equally to EKL’s arguments that their experts’ testimony and opinions contradicted or differed from those of the plaintiffs. Thus, as long as the record contains ample evidence to reasonably support the jury’s verdict, the jury’s choice on whom or which evidence to believe is not manifest error.
| 15Therefore, although we have reviewed the entire record and recognize it contains differing opinions by some of the defendant’s experts, it is not our function as the reviewing court to re-weigh that evidence. Because we find the jury’s verdict was sufficiently and reasonably supported by the evidence in the record, we need not discuss the contrary evidence presented by EKL’s experts.
We do note, however, that our review reveals that even some of the evidence relied on by EKL established that Ms. Kirby’s condition on August 4 should have required a quick surgical consult (which in this case was not done until the following day and after it was too late). For example, EKL’s expert, Dr. Michael Payue, testified that most physicians facing Ms. Kirby’s situation would have at least ordered a CT scan, and that Ms. Kirby should have been NPO (i. e., discontinuance of the oral laxatives) at that point in time. Also, Dr. Joseph Kerry Howell, another of EKL’s experts, testified that a patient who continues to complain of pain after haying an enema should not be given repeat enemas. He also testified that by the early morning of August 5, given Ms. Kirby’s level of pain and agony, she should not have been given anything else by mouth, nor would he have given her magnesium citrate. Finally, even Dr. Howell agreed that had she been taken to surgery when Dr. Dominguez first examined her, Ms. Kirby’s life could have been saved.
For all the foregoing reasons, we find no merit in EKL’s assignments of error. The record amply and reasonably supports the jury’s findings that the administrative staff and the internal medicine physicians and staff breached the standard of care owed to Ms. Kirby and that these breaches caused her injuries and ultimate death.
*12 TRIAL JUDGE’S COMMENT DURING VOIR DIRE
Standard of Review
 A trial court is afforded vast discretion in determining whether to grant a mistrial, Boutte v. Kelly, 02-2451 (La.App. 4 Cir. 9/17/03), 863 So.2d 530, 549. An appellate court may not disturb a trial court’s denial of a motion for mistrial absent a showing of an abuse of that discretion. Chalmette Retail Center, L.L.C. v. Lafayette Ins. Co., 2009-0217 (La.App. 4 Cir. 10/16/09) 21 So.3d 485, 507.
11 ^Discussion/Analysis
The judge, in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted. La. C.C.P. art. 1791. This article is intended to circumscribe any indication by the trial judge in the presence of the jury of any opinion on the factual merits of a party’s claim. However, even if the trial judge violates the prohibition against commentary on the evidence that does not automatically require reversal (or mistrial). That drastic result is only mandated when a review of the record as a whole reveals that the improper comments made by the trial judge were prejudicial to the extent that the complaining party was deprived of a fair trial. In this case, EKL asserts that the trial judge, during voir dire, made comments in violation of La. C.C.P. art. 1791 and that the jury’s verdict may have been incurably tainted by those statements. EKL further claims that it was prejudiced by the comments and the trial judge’s admonition was insufficient to cure the damage.
During voir dire, the prospective jurors were asked if they had any strong feelings one way or the other about lawsuits and litigation. One of the prospective jurors responded that in her opinion, there were too many lawsuits. The trial judge responded as follows:
And having that feeling ... — a lot of people have expressed that opinion, and I will tell you that as a trial judge, we see — we get a lot of cases filed every year. Some have more merit than others, but generally, the ones that don’t have as much merit are sort of ferried out through the pre-trial process. And those, more times than not, usually don’t get to trial.
Not a problem at all to feel that way, but what I have to ask you and what the parties want to know is can you say I’m going to set that feeling aside; I’m going to listen to the evidence and testimony in this case and based on what I hear[,] decide it on its merits?
The prospective juror responded in the affirmative, and the trial judge continued:
Because I can virtually assure you this case wouldn’t be before you if it was a frivolous case. I mean this is a matter with a genuine dispute that has to be tried. So this 117will not fall — the cases before the Court, and I can tell you with no hesitation, would never fall into the category of a frivolous litigation, and I’m speaking from 17 years of sitting up here and looking at cases. You know, that’s the purpose of the trial.
We have certain disputes that can’t be resolved. And as- a result, rather than have them, go fight it out in the streets, they bring the dispute in a peaceful manner into court, present the case to a jury of their peers to try and decide and resolve that dispute for the parties. And that’s what’s being asked of member[s] of the jury today, to sit, listen, to consider, to weigh all of the evidence *13 and testimony presented, and to try and arrive at a decision to resolve this dispute. Can you do that? ■
The prospective juror again responded in the affirmative, and the voir dire continued with the second and third panels of prospective jurors. The jury was selected and sworn, and court recessed until 9:0.0 a.m. the following day. However, when the trial commenced the next day, prior to opening statements, counsel for EKL made an oral motion for a mistrial, asserting that the trial judge’s statements made the prior day, to -the effect that once a case reaches the. stage of a trial, it is not a frivolous lawsuit, and that there was a genuine dispute in the case, “might have gone a little too far into a comment on'the evidence.” EKL also characterized the trial judge’s statements as “a comment on what you knew already about the case that they don’t know” and as having had a “chilling effect on the second voir dire.”
The trial judge denied EKL’s motion on the merits, stating there was “absolutely no basis in law or fact” for a mistrial/new trial. The trial judge characterized his statements as “general statements regarding volumes of litigation, the numbers that come to trial, and the fact that often times these type’s of frivolous cases are weeded out before they get to trial.” He specifically denied that such was a comment on any evidence (where none had yet been presented), nor did it repeat or comment on the testimony of any witness. Thus, the trial judge found he had not violated La. C.C.P. art. 1791.
However, the trial judge also noted that counsel for EKL waited until after the entire jury had been chosen, empanelled, and sworn, and until the next day of trial, just prior to opening statements to raise their objection. The trial judge also admonished [^counsel for EKL, stating, “I don’t appreciate your waiting to see if you get a favorable jury and then if you don’t want them, we’re going to file — we’re going to start all over.” The trial judge further maintained that EKL should have objected when the. comment arose and when they had- an “opportunity when, the jury was out-' of the- room and you were reviewing your challenge sheets, to make that-a timely challenge.”
We first note that the statements made by the trial judge during voir dire of prospective jurors could not have'been comments about the facts or the evidence of the case that are prohibited by La. C.C.P. art. 1791, because at that point in the case, ho facts or evidence had been put before the court or the jury. In criminal cases, La.C'.Cr.P. art. 772 contains an almost identical prohibition of comments by the trial judge on the facts or the evidence, and the jurisprudence consistently reflects that comments by sc trial judge during voir dire can not be considered violations of that prohibition because no facts or evidence are yet before the court. See State v. Gallow, 338 So.2d 920, 922 (La.1976); State v. Pooler, 96-1794 (La.App. 1 Cir. 5/9/97), 696 So.2d 22, 37.
Further, in the context in which the statements were made, we find they were a permissible explanatory attempt to rehabilitate a prospective juror who openly opined she felt there were too many lawsuits. Moreover, in' making the statements, the trial judge also clearly explained the proper function and obligation that the jurors would have in listening to, considering, and weighing all of the evidence and testimony'presented to reach a decision and resolve the dispute presented. The trial judge did not, as- suggested by EKL, make an affirmative statement about the merits of the case, rather, the statements were made to generally explain that when a ease reaches the trial stage, there are genuine disputes that require resolu *14 tion by the jury. Thus, the trial judge’s explanation at this junction, together with the jury instructions later given, were merely a valid and warranted explanation to the jury regarding Its proper role In evaluating evidence and deciding the issues presented by the evidence. Mistrial is a drastic measure, and it is well settled that a verdict will not be set aside because of improper remarks by the judge unless the reviewing court is thoroughly convinced that hflthe jury was influenced by the remarks and that they contributed to the verdict. Id. We find the trial judge’s explanation during voir dire regarding the proper role of the jury together with the proper and adequate jury instructions that were later given simply aided the jury in fulfilling its role and did not at all prejudice the defendant or contribute to the verdict.
Finally, we agree with the trial judge that EKL had ample opportunity to object at the time the allegedly prejudicial statements were made, but instead, waited until after two more jury panels were voir dired, the final jury empanelled and sworn, and the following day of trial, prior to opening statements, to raise its objection. This type of trial strategy/conduct is not to be encouraged or tolerated. See Johnson v. H.W. Parson Motors, Inc., 231 So.2d 73, 78-79 (La.App. 1 Cir.1970).
For all these reasons, this assignment of error lacks merit.
ANSWER TO APPEAL
The plaintiffs answered the appeal, and in one sentence, state that they are entitled to damages for frivolous appeal, including attorney fees and costs. They present no further argument in furtherance of this request. Louisiana Code of Civil Procedure article 2164 provides that an appellate court may award damages, including attorney fees, for a frivolous appeal, and may tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as in its judgment may be considered equitable. The courts have been reluctant to grant damages under this article, as it is penal in nature and must be strictly construed. Guarantee Systems Const. & Restoration, Inc. v. Anthony, 97-1877, (La.App. 1 Cir. 9/25/98), 728 So.2d 398, 405, writ denied, 98-2701 (La.12/18/98), 734 So.2d 636. In order to assess damages for a frivolous appeal, it must appear that the appeal was taken solely for the purpose of delay or that counsel does hot sincerely believe in the view of law he advocates. Id. Furthermore, because appeals are favored in our law, penalties for the filing of a frivolous appeal will not be imposed unless they are clearly due. Henkelmann v. Whiskey Island Preserve, LLC, 2013-0180 (La.App. 1 Cir. 5/15/14), 145 So.3d 465, 471.
|2nWe do not agree with EKL’s arguments and find that its assignments of error lack merit. However, we cannot say this appeal was taken solely for the purpose of delay or that appealing counsel does not seriously believe in the position he advocates. Therefore, we decline to award damages for frivolous appeal.
CONCLUSION
For all the foregoing reasons, we affirm the judgment of the trial judge, adopting the jury’s verdict. Costs of this appeal, in the amount of $5,878.00 are assessed to the defendant, the State of Louisiana through the Louisiana State Board of Supervisors, The Louisiana State University Health Sciences Center, Earl K. Long Medical Center.
AFFIRMED.
KUHN, J., concurs in part and dissents in part and assigns reasons.

. DIC, disseminated intravascular coagulation, is a hemorrhagic disorder that occurs following the uncontrolled activation of clotting factors and fibrinolytic enzymes throughout small blood vessels, resulting in tissue necrosis and bleeding.

. The jury declined find that the ER physicians and staff or the surgical physicians and staff at EKL breached the standard of care owed to Ms. Kirby. These findings have not been appealed.

. The x-ray taken that night was lost, and therefore, unavailable as evidence at the time of trial,

. NPO, derived from the Latin phrase nil per os, is a commonly used medical abbreviation for withholding oral food and fluids from a patient for various reasons.