862 So.2d 1010 (2003)
SECRET COVE, L.L.C.
v.
George Ronald THOMAS and His Wife, Audrey Lee Dykes Thomas
No. 2002 CA 2498.
Court of Appeal of Louisiana, First Circuit.
November 7, 2003.
Rehearing Denied January 22, 2004.
*1013 Ronald W. Guth, Slidell, for Plaintiff-Appellant Secret Cove, L.L.C.
Howard R. Fussell, Jones Fussell, L.L.P., Covington, for Defendants-Appellees George Ronald Thomas and Audrey Lee Dykes Thomas.
Before: CARTER, C.J., PARRO, and GUIDRY, JJ.
PARRO, J.
Secret Cove, L.L.C., the record owner of certain real property, appeals a judgment declaring that George Ronald Thomas and his wife, Audrey Lee Dykes Thomas (the Thomases), acquired ownership of a portion of that property by thirty-year acquisitive prescription. Based on our review of the facts and law, we affirm in part, vacate in part, and remand for amendment of the judgment.

FACTUAL AND PROCEDURAL BACKGROUND
On April 28, 1997, Secret Cove, L.L.C. (Secret Cove), a corporation owned by Dr. Robert M. Hogan and his wife, Deborah Surgi Hogan (the Hogans), bought a tract of rural land in Section 35, Township 5 South, Range 13 East, St. Tammany Parish, containing approximately 216 acres.[1] The property is south of Lock No. 2 and borders the western edge of the Pearl River Navigational Canal (the canal); the southern boundary of the property is the section line between Section 35 and Section 48. At the time of the purchase, a small portion of the property, between one and three acres[2] in the extreme southeastern part of the tract adjoining the canal (the disputed property), was the site of a campground operated by the Thomases. The Thomases were and are the record owners of property in Section 48 that is immediately adjacent to and south of the disputed property. The disputed property, a narrow finger of land alongside the canal, extends perpendicularly from the section line northward into Section 35. After Secret Cove bought the property in Section 35, the Hogans attempted to obtain possession of the disputed property; however, the Thomases refused to leave. Eventually, this litigation between the parties ensued.
Secret Cove filed this suit as a petitory action on October 29, 1999, claiming ownership of and seeking possession of the disputed property, along with damages for trespass and lost revenues. The Thomases reconvened, claiming that they possessed the disputed property and that they and their family had possessed it continuously and openly since about 1957. They claimed that by virtue of thirty-year acquisitive prescription, they had acquired ownership of the disputed property.
*1014 Secret Cove presented evidence of its title, and the parties stipulated at trial that Secret Cove had valid record title to the disputed property. Therefore, the only issues at trial concerned the extent and nature of the Thomases' possession and whether it met the legal requirements for thirty-year acquisitive prescription.[3] Following the trial, the court ruled in favor of the Thomases, finding they had continuous and open possession of the disputed property for thirty years, with the intent to own it and within certain described visible boundaries. The court concluded that although the Thomases' title over their property in Section 48 did not extend to the disputed property in Section 35, the possession of the disputed property by Jack J. Thomas, which began in 1957, could be tacked to that of his son, George Ronald Thomas.[4] By tacking the father's possession to the son's possession, the court concluded the Thomases had reached the thirty years required for acquisitive prescription.
The judgment was signed July 9, 2002, maintaining the Thomases' plea of thirty-year acquisitive prescription and declaring them to be the owners of the disputed property. Secret Cove appealed, assigning as error the trial court's factual findings relative to visible boundaries; its conclusions that the nature and extent of the Thomases' possession satisfied the legal requirements for thirty-year acquisitive prescription; its signing of a judgment in which the eastern boundary line is described differently from the court's findings as set forth in its reasons for judgment;[5] and its credibility determinations with respect to the witnesses who testified at the trial.[6]

APPLICABLE LAW
In Louisiana, the petitory action is available for the recovery of immovable property. A.N. Yiannopoulos, Property § 268, at 540, in 2 Louisiana Civil Law Treatise (4th ed.2001). The petitory action is brought by a person who claims ownership, but is not in possession, of immovable property, against another who is in possession or who also claims the ownership of that property, seeking to obtain judgment recognizing the plaintiff's ownership. See LSA-C.C.P. art. 3651. Acquisitive prescription beyond title by possession to a visible boundary for a period of thirty years may be pleaded as a defense in a petitory action. Cuthbertson v. Unopened Succession of Tate, 544 So.2d 1236, 1239 (La.App. 3rd Cir.1989). In a petitory action, when one party relies on title and the other on acquisitive prescription, the party relying on title will prevail unless the adversary establishes his ownership by acquisitive prescription. Pace v. Towns, 33,071 *1015 (La.App. 2nd Cir.4/5/00), 756 So.2d 680.
Ownership of immovable property may be acquired by the prescription of thirty years without the need of just title or possession in good faith. LSA-C.C. art. 3486. Ownership of immovable property under record title may be eclipsed and superseded by ownership acquired under prescriptive title. Under the general codal provisions on acquisitive prescription, a possessor lacking good faith and/or just title may acquire prescriptive title to land by corporeally possessing a tract for thirty years with the intent to possess as owner. Such possession confers prescriptive title upon the possessor only when it is continuous, uninterrupted, peaceable, public, and unequivocal, and confers title only to such immovable property as is actually corporeally possessed. See LSA-C.C. arts. 3424, 3426, 3476, 3486, 3487, and 3488; Falcone v. Springview Country Club, Inc., 96-0794, 0795, and 0796 (La.App. 1st Cir.3/27/97), 691 So.2d 314, 316.
For purposes of acquisitive prescription without title, possession extends only to that which has been actually possessed. LSA-C.C. art. 3487. Actual possession must be either inch-by-inch possession or possession within enclosures. According to well-settled Louisiana jurisprudence, an enclosure is any natural or artificial boundary. LSA-C.C. art. 3426, comment (d), Revision Comments1982, citing A.N. Yiannopoulos, Property §§ 212-214, in 2 Louisiana Civil Law Treatise (2d ed.1980). The party who does not hold title to the disputed tract has the burden of proving actual possession within enclosures sufficient to establish the limits of possession with certainty, by either natural or artificial marks, giving notice to the world of the extent of possession exercised. Conway v. Crowell Land & Mineral Corp., 93-1158 (La.App. 3rd Cir.4/6/94), 635 So.2d 544, 549-550, writ denied, 94-1198 (La.7/1/94), 639 So.2d 1166; Hill v. Richey, 221 La. 402, 420, 59 So.2d 434, 440 (1952).
One is presumed to intend to possess as owner unless he began to possess in the name of and for another. LSA-C.C. art. 3427. The intent to possess as owner may be inferred from all of the surrounding facts and circumstances. Livingston v. Unopened Succession of Dixon, 589 So.2d 598, 602 (La.App. 2nd Cir.1991).
Possession can be transferred by universal title or by particular title. LSA-C.C. art. 3441. When possession is so transferred, the possession of the transferor is tacked to that of the transferee if there has been no interruption of possession. LSA-C.C. art. 3442. Under these provisions, privity of contract or estate is an essential prerequisite to tacking of possession. Brown v. Wood, 451 So.2d 569, 573 (La.App. 2nd Cir.), writ denied. 452 So.2d 1176 (La.1984).
Alternatively, under Louisiana Civil Code article 794,[7] a title holder may acquire more land than his title calls for by possessing property beyond his title for thirty years without interruption and within visible bounds. Such a title holder may attain the thirty-year possessory period which is necessary to perfect prescriptive *1016 title in the absence of good faith and just titleby "tacking" on to the possession of his ancestor in title. LSA-C.C. arts. 794 and 3442; Brown, 451 So.2d at 572-73; Falcone, 691 So.2d at 317. Under Article 794, the privity of title between the possessor and his ancestor in title need not extend to the property to which the possessor asserts prescriptive title; under this article, the juridical link, or written instrument that passes to the possessor from his ancestor in title need not encompass or include the particular property to which the possessor claims prescriptive title. Brown, 451 So.2d at 572-73. In that sense, tacking under Article 794, which allows one to prescribe beyond title on adjacent property to visible boundaries, differs from tacking under Articles 3441 and 3442, which limit tacking for prescriptive purposes to the property described in title documents. See Brown, 451 So.2d at 573.
Whether a party has possessed property for purposes of thirty-year acquisitive prescription is a factual determination by the trial court and will not be disturbed on appeal unless it is clearly wrong. Phillips v. Fisher, 93-928 (La. App. 3rd Cir.3/2/94), 634 So.2d 1305, 1307, writ denied, 94-0813 (La.5/6/94), 637 So.2d 1056. Additionally, boundary location is a question of fact, and the determination of its location by the trial court should not be reversed absent manifest error. Bowman v. Blankenship, 34,558 (La.App. 2nd Cir.4/4/01), 785 So.2d 134, 138, writ denied, 01-1354 (La.6/22/01), 794 So.2d 794. Where findings are based on determinations regarding the credibility of witnesses, the trier of fact's findings demand great deference and are virtually never manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989); Gewalt v. Stevens, 98-2666 (La. App. 1st Cir.9/24/99), 757 So.2d 705, 707, writ denied, 99-3063 (La.1/7/00), 752 So.2d 865.

DISCUSSION
The trial court provided extensive written reasons, summarizing the evidence supporting its judgment and explaining how that evidence met the legal criteria for adverse possession sufficient to acquire ownership of immovable property. We will not attempt to re-summarize that evidence. However, we will briefly examine those factors necessary to address the assignments of error.
Evaluation of Witnesses' Testimony
First, we note that Secret Cove questions the trial court's assessment of the credibility of the fact witnesses called by the Thomases, along with its reliance on such "vague and contradictory testimony" to establish the facts of possession. The court's decision to discount the testimony of one of Secret Cove's experts has also been questioned. It is axiomatic that when factual findings are based on the credibility of witnesses, the fact-finder's decision to credit a witness's testimony must be given "great deference" by the appellate court, for only the fact-finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell, 549 So.2d at 844. It is only when documents or objective evidence so contradict the witness's story or the story itself is so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit the witness's story, that the court of appeal may find manifest error or clear wrongness *1017 even in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d at 844-45. But where such factors are not present, and a fact-finder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell, 549 So.2d at 845. Further, the rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Ins. Co., 563 So.2d 850, 853 (La.1990).
Having examined the testimony and documentary evidence, we find no inconsistency, implausibility, or other indicia sufficient to establish that the trial court's conclusions concerning the witnesses were clearly wrong. While this court might have evaluated some or all of that testimony differently, the assessments are well within the trial court's purview and are not unreasonable. Therefore, this assignment of error is without merit.
Visible Boundaries
In two of its assignments of error, Secret Cove alleges the trial court erred in: (1) establishing visible boundaries when there are none on three of the four sides of the disputed property, and (2) determining the Thomases had acquired ownership of that property through thirty-year acquisitive prescription by finding visible boundaries and possession. The court stated that two of the boundaries are not in dispute, those being the section line on the south and the canal on the east. Although Secret Cove argues that a section line is not visible, various maps in evidence show that the section line is marked on the ground by concrete monuments set in place by the U.S. Army Corps of Engineers. Therefore, we find no error in the trial court's determination that one of the visible boundaries of the Thomases' possession is the section line.
However, although the parties agree that the canal constitutes the visible eastern boundary of the Thomases' possession of the disputed property, the judgment differed from the written reasons and described that boundary as "a point out in the canal to establish a line which will clear all docks and improvement[s] in the water." Both parties state this was an error, because possession to this extent was not established for the requisite amount of time, and agree that the judgment should have set the eastern boundary as the west bank of the canal. Based on the photographic and testimonial evidence, which indicates no dock-building activity on the disputed property until the 1970's, this court agrees that this aspect of the judgment is in error.
As noted by the trial court, the most problematic "visible boundaries" involve the northern and western limits of the Thomases' possession. The court fixed these boundaries in accordance with a map or plat of survey by Billy C. Daniels, who surveyed the disputed property for the Thomases. The trial court set the northern boundary of their possession along the southern edge of a natural drainage feature, known to the Thomases as "Jessie Bayou," which drains into the canal from the swamp area to the north and west of the disputed property. Secret Cove argues there was no evidence to show possession to that point, but only that the Thomases conducted some activities involving a large sand pile just south of that waterway.
We disagree with this characterization of the evidence. Reverend William J. Harris, who is George Thomas's half brother, testified that George's father, Jack J. Thomas, had a sand and gravel *1018 business on the Thomas property in Section 48 and used the disputed property to stockpile the product. According to him, these piles extended from the section line "all the way up here to Jessie Bayou," right to the edge of it. In connection with the sand and gravel business, "the waterfront," which was what the Thomas family called the disputed property, was where barges were tied while the product was being loaded. He recalled that one of those barges got loose in 1957 and floated to the north until it ran aground at a sandbar at Jessie Bayou. The sand pile immediately to the south of Jessie Bayou is what remains of the sand and gravel that Rev. Harris off-loaded from that barge so it could be re-floated. After that year, the family used a bulldozer to clear and maintain the road "all the way back up here to Jessie Bayou."
Jack H. Thomas, George's brother, confirmed the location of the sand and gravel piles and said the road was kept open because his father "sold gravel from up there," and the buyers used the road to access the material. The sand and gravel business continued from the late fifties until the campground was built in 1967. Josephine Thomas, who is George Thomas's mother, confirmed that the family had used the waterfront property for "over fifty years," up to Jessie Bayou. She recalled that some of her husband's friends liked to camp there, because they had mentally handicapped children who could be allowed to play on the sand pile in safety. George Thomas testified that after the commercial campground was started in 1967, his father "always kept underbrush out of there, and he always kept that road cleared that runs along the canal." He also said that on the north end, the grassy area was always kept cleared, because "that's mainly where we picnicked and tent camped."
The surveys, aerial photographs, and topographic maps in the record clearly show the elevated sandy area just south of Jessie Bayou, although the waterway itself is not so clearly marked and is not named on the maps. However, there was consistent testimony concerning the existence of this natural boundary and the activities of the Thomas family up to that feature, including the sand and gravel operation, tent camping, picnics, road maintenance, and clearing of underbrush. This evidence supports the trial court's finding that the southern edge of Jessie Bayou is a visible boundary marking the northern limit of the Thomases' possession of the disputed property. Of course, there was evidence to the contrary from Secret Cove's witnesses. But the function of the trial court is to make a choice between conflicting versions of events, and this court cannot say, on the basis of the record in this case, that the trial court's choice of this boundary is clearly wrong.
Similarly, with respect to the western boundary, the record contains numerous references to a distinct difference in elevation between the disputed property and the swamp area lying immediately to its west. According to Daniels, "there's about a two-foot difference in height there," along which he drew the western boundary line on his survey. Another surveyor, Jeron Fitzmorris, confirmed that this difference was "visible as a natural distinction between high and low," and observed "by walking along in spots between the high and the low that it's a naturalit's sort of like a natural boundary as a river bank would be." Jack H. Thomas testified that at some point, his father had painted marks on some of the cypresses along the edge of the swamp "to keep people from running off into the swamp" where there was quicksand. Frank Thomas said the line between the *1019 "waterfront property" and the swamp was especially evident when the water was high, because then the disputed property "would be the only place that the land would be showing." Topographic maps confirm the existence of this natural feature distinguishing the area used by the Thomases from the "gum swamp" to its west.
Secret Cove's brief to this court states that the best legal definition describing what is required for a visible boundary is in Rathborne v. Hale, 95-1225 (La.App. 4th Cir.1/19/96), 667 So.2d 1197, 1201, writ denied, 96-0747 (La.5/3/96), 672 So.2d 692, where the court stated:
An enclosure does not require a fence but it does require that the land possessed as owner may be established with certainty, either by natural or artificial marks, sufficient to give notice to the world of the character and the extent of the possession, as well as its full identity and its certain boundaries.
Applying this definition, we conclude that the visible boundaries recognized by the trial court, with the exception of the error concerning the canal on the east, are supported by the evidence and are sufficiently certain and identifiable to meet the legal criteria.
Possession
In the Rathborne case, the court ultimately concluded that although certain visible boundaries existed, the adverse possessor had not established by a preponderance of the evidence his requisite thirty years of "continuous, uninterrupted, adverse possession up to that boundary" with intent to own. Rathborne, 667 So.2d at 1209. In the matter before us, the parties stipulated that the Thomases had been in continuous corporeal possession of the disputed property and had been using it as a campground since 1975. Therefore, it is their possession between October 1969 and 1975 that is crucial to the resolution of this case.
To have legal effect, possession must be continuous, uninterrupted, peaceable, public, and unequivocal as to the intent of the possessor to own the property. See LSA-C.C. arts. 3435 and 3436. One who proves that he had possession at different times is presumed to have possessed during the intermediate period. LSA-C.C. art. 3443. The quality of possession required up to a visible boundary in a particular case depends upon the type of land in dispute. Liner v. Louisiana Land and Exploration Co., 319 So.2d 766 (La.1975); Cuthbertson, 544 So.2d at 1239. The land involved in this case is wild, undeveloped, rural property; the entire area is virtually uninhabited except for the Thomases to the south, and the disputed property is inaccessible except by boat or by a road through the Thomas property. The Thomases did not occupy the disputed property or any part of it on a continuous basis during these years; however, possession does not require them to inhabit the property or be constantly present on it. Corporeal possession is the exercise of physical acts of use, detention, or enjoyment over a thing. LSA-C.C. art. 3425. The evidence shows continuity of their possession during the years in question by clearing the underbrush, maintaining the road alongside the levee, and developing the campground area. Testimony of several witnesses revealed that the clearing for the campground, which began in 1967, continued during later years as the camping activity increased. The aerial photographs, as interpreted by experts for both sides, show clearing activity on both sides of the road in 1967, plus removal of ground vegetation and the presence of dirt piles along the canal. The large sand pile just south of Jessie Bayou is also clearly visible, *1020 as is the road leading to it. A 1971 photograph shows additional widening of the road and a possible "turn-around" area on the disputed property. By 1973, three trails can be clearly seen on the disputed property, leading from the road to the canal. A 1975 photograph shows extensive clearing and five small structures on the disputed property. By 1978, there were permanent structures on the disputed property, along with a number of boat docks.
The Thomases exercised possession as if they owned the disputed propertygiving permission for their friends to use the property for camping, fishing, and picnicking; allowing people to use the road to access the sand pile near Jessie Bayou; selling or giving away the sand and gravel on the property; tying up boats and using the waterfront for recreation whenever they pleased; and eventually expanding their commercial campground to include the property. They took possession of the property peaceably and openly, and in all the years they used it until this suit was there is no evidence that anyone every questioned their right to use the property or tried to remove them from it.
Based on our review of the evidence in this case, we find a reasonable factual basis in the record for the trial court's finding that the Thomases possessed the disputed property as owners for thirty years. The evidence supports the conclusion that the nature and extent of that possession the requirements of acquisitive prescription. Furthermore, we find nothing in the record to convince us that the trial court's conclusion was manifestly erroneous. The trial court's application of the legal principles of tacking under Louisiana Civil Code article 794 were also correct, thereby allowing the possession beyond the title of Jack J. Thomas to be added to that of his son to reach the requisite thirty years for ownership under acquisitive prescription.
As previously noted, we also agree with the trial court's finding that this possession was within visible bounds. However, the portion of the judgment describing the eastern boundary is erroneous. As the property description in the judgment uses compass points and measurements in accordance with a survey by Billy C. Daniels, this court is unable to amend the judgment without the benefit of similar information. A judgment affecting title to immovable property shall describe the immovable property affected with particularity. LSA-C.C.P. art.1919. Because this court is unable to render a judgment with an accurate legal description of the entire property, the portion of the trial court's judgment describing the property must be vacated. The case will be remanded to the trial court to receive evidence to establish the eastern boundary of the property; to make adjustments to the acreage in the property description, taking the revised boundary into consideration; and to render a judgment with a complete and accurate legal description of the property affected by the judgment.

CONCLUSION
The judgment of the trial court is affirmed, with the exception of the property description in the judgment. That portion of the judgment is vacated, and the case is remanded for receipt of evidence to establish the eastern boundary and acreage and render a judgment describing the property in accordance with this opinion.
AFFIRMED IN PART, VACATED IN PART, AND REMANDED.
NOTES
[1] The sale documents were executed by the numerous sellers on various dates in April 1997; the document was recorded on April 28, 1997.
[2] A survey done by John G. Cummings for the Hogans showed the existing campsites were situated on 1.15 acres; another survey done by Billy C. Daniels for the Thomases showed the area over which the Thomases claimed possession was a little over 2.7 acres.
[3] Because the filing of this suit acted as an interruption of that possession, the Thomases had to establish that they had possessed the disputed property since October 29, 1969.
[4] In 1985, Jack J. Thomas and his wife sold a portion of the property in Section 48 to George and his wife to be used as a campground.
[5] Both parties agree that if this court determines the trial court was correct in finding the Thomases acquired ownership of the disputed property by thirty-year acquisitive prescription, the eastern boundary line should be modified to conform to the evidence and the written reasons for judgment.
[6] An additional assignment of error alleged a lack of due process, in that the case was tried for half a day on September 12, 2001, half a day on November 15, 2001, half a day on March 6, 2002, and several hours on March 7, 2002. However, this assignment of error was not briefed and is considered abandoned. See Uniform Rules, Courts of Appeal, Rule 2-12.4; Canizaro v. Tangipahoa Parish School System, 02-1913 (La.App. 1st Cir.8/20/03), 853 So.2d 741, 744 n. 2.
[7] Although Article 794 is in Book II, Title VI of the Louisiana Civil Code, which deals with boundaries and disputes concerning boundary fixing and location, the jurisprudence has extended its principles to situations that are not, strictly speaking, boundary disputes. See, e.g., Swartley v. Feiber, 560 So.2d 507, 509 (La.App. 1st Cir.1990). This case would fit that category, as both parties recognize that the boundary of record between their properties is the section line, which is described in their title documents and is clearly marked on the ground.