PETTIGREW, J.
|Jn this personal injury suit arising out of an intersectional collision between an ambulance and a vehicle that occurred December 4, 2008, the plaintiff, an EMT who was a passenger in the ambulance and injured as a result of the. collision, appeals a judgment rendered in accordance with a jury verdict. The jury verdict found no liability on the part of the defendants, Richard Seal, the volunteer firefighter who was driving .the ambulance; Washington Parish Fire District # 6 (WPFD); .and its insurer, American Alternative Insurance Corporation (AAIC). The plaintiff, contending there is no reasonable basis in the record for the jury’s findings and that the jury verdict is manifestly erroneous, seeks reversal of that judgment, and a remand, for a determination of the amount of damages due.
FACTUAL SUMMARY AND PROCEDURAL HISTORY
On December 4, 2008, in the early afternoon, defendant Richard Seal and his friend Ben Ritter, both volunteer firefighters for WPFD, were riding together, in Seal’s truck in Bogalusa, Louisiana, when they received notice of a “man down” Code 8[1] medical emergency at a home in nearby Varnado, Louisiana. Although Mr. Seal and Mr. Ritter were off duty and on a personal mission, they responded to the call and proceeded to the location of the medical emergency. ■ When they arrived, they observed other responding firefighters who* had arrived before them administering CPR to.Mr. Sanderson, who was lying on the floor,, unresponsive. .
Mr. Seal and Mr. Ritter took over administering CPR, in order to give the other firefighters a break, and continued doing so, until Randy Kirkland, a paramedic, and the plaintiff, Jeremy Freeman, an EMT, arrived in an Advanced Care Ambulance. Mr. Kirkland and Mr. Freeman *94 then took over CPR, used a defibrillator, and loaded Mr. Sanderson onto a stretcher and into the back of the ambulance, where they would continue resuscitation efforts in route to the nearest hospital. (Although Mr. Sanderson remained |snonresponsive, Mr. Freeman testified that the paramedic, Mr. Kirkland, after speaking with Mr. Sanderson's wife, made the decision to continue the response as a Code 3 emergency and that he and Mr. Freeman would ride in the back of the ambulance and continue resuscitation efforts on Mr. Sand-erson.) The paramedic asked for a firefighter to volunteer and drive the ambulance, as is frequently done when both the paramedic and EMT are needed in the back of the ambulance. Mr. Seal, who was trained and qualified to drive fire trucks and other emergency fire vehicles, volunteered, and proceeded to drive the ambulance to the hospital.[2] (Mr. Ritter, driving Mr. Seal’s truck, followed behind the ambulance.)
The ambulance had both its emergency lights and sirens engaged, as required by the Code 3 designation of the emergency. Mr. Seal proceeded to drive the ambulance southbound on La. Highway 21 (Hwy 21). When the ambulance reached and entered the intersection of Hwy. 21 and La. Highway 10 (Hwy. 10), it was struck in the right rear by a blue Honda that was trav-elling eastbound on Hwy. 10 and had also proceeded into the intersection. The force of the collision caused the ambulance to tilt over on two wheels, then bounce back onto four wheels, and slide, until it collided with a second vehicle — a white Nissan that was stopped at the traffic light in the northbound lane of Hwy. 21 (opposite the lane in which the ambulance had been driving).
As a result of the initial impact with the Honda, Mr. Freeman, who had been seated, unrestrained, in the “captain’s chair” was injured as a result of being thrown around in the back of the ambulance. On December 3, 2009, Mr. Freeman filed suit to recover damages for those injuries.
Several defendants were named in the original and ensuing supplemental petitions; however, at the time of trial, the only remaining defendants were Mr. Seal, pWPFD, and its insurer, AAIC. Following a six-day trial, the jury rendered a verdict on March 3, 2014, in favor of the defendants. Specifically, the jury responded affirmatively to the following verdict interrogatories:
Interrogatory No. 1
Do you find that the ambulance driven by Richard Seal was responding to an emergency call?
Interrogatory No. 2
Do you find that the ambulance’s audible or visual signals were sufficient to warn motorists of its approach?
Interrogatory No. 3
Do you find that Richard Seal slowed or stopped the ambulance at the intersection of Hwy 10 & 21 as may be necessary for the operation of the ambulance and the safety of all persons?
Having answered “yes” to the first three interrogatories, the jury was then instructed to answer Interrogatory 10:
*95 Do you find that Richard Seal acted with reckless disregard for the safety of others on December 4, 2008? ■
The jury responded “no,” and was directed by the verdict form to have it signed by the jury foreperson. In accordance therewith, a judgment was signed April 13, 2014, in favor of the defendants, Richard Seal, Washington Parish Fire District # 6, and American Alternative Insurance' Corporation, and against the plaintiff, Jeremy Freeman, dismissing his lawsuit at his cost. On May 13, 2014, the judgment was revised to indicate that each party would bear its own costs. It is from that judgment that Mr. Freeman appeals. After the May 13, 2014 judgment was rendered, Mr. Freeman filed a motion for judgment notwithstanding the verdict or in the alternative, a new trial, which was denied by the district court on July 16, 2014.
STANDARD OF REVIEW
It is well settled that a court of appeal may not set aside a jury’s finding of fact in the absence of manifest error or unless it is clearly wrong, and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own evaluations and inferences are reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Kirby v. State ex rel. Louisiana State University Bd. of Sup’rs, 2014 WL 5791567, p. 5, 2014-0017 (La.App. 1 Cir. 11/7/14), 174 So.3d 1.
The supreme court has announced a two-part test for the reversal of a fact finder’s determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Stobart v. State, through Department of Transportation and Development, 617 So.2d 880, 882 (La.1993); Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, the issue to be resolved by a reviewing court is not whether the trier-of-faet was right or wrong, but whether the fact finder’s conclusion was a reasonable one. Stobart, 617 So.2d at 882. Where factual findings are based on determinations regarding the credibility of witnesses, the trier-of-fact’s findings demand great deference. Boudreaux v. Jeff, 2003-1932, p. 9 (La.App. 1 Cir. 9/17/04), 884 So.2d 665, 671; Secret Cove, L.L.C. v. Thomas, 2002-2498, pp. 6-7 (La.App. 1 Cir. 11/7/03), 862 So.2d 1010, 1016, writ denied, 2004-0447 (La.4/2/04), 869 So.2d 889. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists, in the testimony. Rosell, 549 So.2d at 844; Graphia v. Woolfolk, 2007 WL 466746, 2 (La.App. 1 Cir. 2/14/07) (unpublished opinion); writ denied, 2007-0542 (La.5/4/07), 956 So.2d 613.
Applying the foregoing standards to our review of the entire record, we find a reasonable factual basis for each of the jury’s findings contested by Mr. Freeman; such that those findings are not clearly wrong or manifestly erroneous. Considering all of the evidence, and giving the deference of correctness owed to the jury’s factual findings and credibility determinations, we find the issue of Mr. Seal’s liability in causing the accident at issue to be a very close call. Indeed, had we been sitting as the fact finder and credibility judge of the conflicting facts and testimony, we may well have reached a different result. However, we owe great deference to the jury’s factual findings because they were based on first-hand and more intimate observation of the witnesses and their testimonies, including the witnesses’ ■ candor, demeanor, forthrightness, etc., -qualities *96 not discemable by this court from a cold written record. Given this deference, together with the fact that | P,there is a reasonable factual basis in the record to support the jury’s factual findings and its ultimate conclusion that Mr. Seal was not liable for his actions while operating the ambulance, we cannot say the jury’s verdict is manifestly erroneous and are constrained to affirm the district court’s judgment adopting that verdict.

APPLICABLE LAW

Louisiana Revised Statutes 32:24, governing emergency vehicles, provides, in pertinent part:
A.' The driver or rider of an authorized emergency vehicle, when responding to an emergency call ... may exercise the privileges set forth in ' this Section, but subject to the conditions herein stated.
B. The driver or rider of an authorized emergency vehicle may do any of the following:
[[Image here]]
(2) Proceed past a red or stop signal or stop sign, but only after slowing down or stopping as may be necessary for safe operation.'
(3) Exceed the maximum speed limits so long as he does not endanger life or property.
[[Image here]]
C, The. exceptions herein granted to an authorized emergency vehicle shall apply only , when such vehicle ... is making use of audible or visual signals
D. The foregoing provisions shall not relieve the driver or rider of an authorized vehicle from the duty to • drive or ride with due regard for the safety of all persons, nor shall . such provisions protect the driver or rider from the consequences of his reckless disregard for the safety of others. (Emphasis added.)
In Lenard v. Dilley, 2001-1522 (La.1/15/02), 805 So.2d 175, after granting writs in the pretrial stage of the case (via a motion in limine), to determine the standard of care imposed on drivers of emergency vehicles by La. R.S. 32:24, our supreme court held that the statute sets out two alternate standards of care depending on the circumstances. The court stated:
If, and only if, an emergency vehicle driver’s actions fit into subsections A, B, and C [of La. R.S. 32:24], will an emergency vehicle driver be held liable only for actions which constitute 1^reckless disregard for the safety of others. On the other hand, if the emergency vehicle driver’s conduct does not fit subsections A, B, and C ... such driver’s actions will be gauged by a standard of “due care.”
‘Due care’ is synonymous with ordinary negligence. ‘Reckless disregard,’ however, connotes conduct more severe than negligent behavior. ‘Reckless disregard’ is, in effect, ‘gross negligence.’ Gross negligence has been defined by this court as ‘the want of even slight care and diligence. It is. the want of that diligence which even careless men are accustomed to exercise.
Lenard, 805 So.2d at 180. (Citations omitted.) The court also discussed the legislative intent to recognize the obvious high social value placed on protection and rescue efforts when it set forth the circumstances for application of the reckless disregard versus the ordinary negligence standard. Id.; see also, Matthews v. Maddie, 2001-1535 (La.App. 1 Cir. 6/21/02), 822 So.2d 739, 741-42, writ denied, 2002-2420 (La.11/22/02), 829 So.2d 1052. The Lenard court reasoned:
*97 Applying an ordinary negligence standard to emergency vehicle drivers in all cases would restrict the effectiveness of individuals responding to emergency situations and would unduly restrain emergency vehicle drivers from performing a vital role in society.
Lenard, 805 So.2d at 180.
In Turner v. Chaney, 2012-0253 (La.App. 1 Cir. 11/2/12), 2012 WL 5385597 (unpublished opinion), writ denied, 2012-2579 (La.1/18/13), 107 So.3d 636, this court, citing Lenard, discussed the different standards of care arising out of La. R.S. 32:24 and applicable to drivers of emergency vehicles. This court explained that a driver of an emergency vehicle will be hable only if his conduct constitutes reckless disregard for the safety of others, thus, rising to the level of gross negligence when (1) the driver is responding to an emergency call; (2) the accident arises out of one of the driver actions listed in subsection (B) of R.S. 32:24; and (3) the driver has employed the audible and visual signals on the emergency vehicle sufficient to warn motorists of its approach. If the driver does not satisfy these three elements, his actions will be gauged by the lesser standard of ordinary negligence.
IsWith regard .to drivers of vehicles approaching an authorized emergency vehicle, La. R.S. 32:125 provides, in pertinent part:
A. Upon the immediate approach of an authorized emergency vehicle .making use of audible or visual signals, ... the driver of every other vehicle shall yield to the right-of-way and shall immediately drive to a position parallel to, and as close as possible to, the right-hand edge or curb of the highway clear of any intersection, and shall stop and remain in such position until the authorized emergency vehicle has passed....
C. This Section shall, not operate to relieve the driver, of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons using the highway.
(Emphasis added.)
SUMMARY OF EVIDENCE — RELEVANT TO ISSUES RAISED HEREIN-REGARDING THE ACCIDENT
Because this court’s only inquiry is whether there is ample support in the record for the, jury’s factual findings, and because the ultimate question of Mr. Seal’s, liability is based on factual issues, this opinion will detail and discuss only that evidence essential to an understanding of how the accident occurred and relevant to the resolution of the issues presented in the assignments of error.
Immediately prior to the accident, Mr. Seal, in the course.and scope of his duties as a volunteer firefighter with the WPFD, was driving the ambulance southbound on Hwy. 21, in route to the hospital (LSU Bogalusa Medical facility), with the vehicle’s lights and sirens on. At the same time, a blue Honda, driven by Stephen Glover, in which Rebecca Wratten was the sole passenger, was travelling in the outside, eastbound lane on Hwy. 10 (perpendicular to the travel path of the ambulance). Both vehicles were proceeding toward the intersection of Hwy. 21 and Hwy. 10, which was controlled by properly functioning traffic lights.
,Hwy. 21 is a four-lane road; and Hwy. 10 is a two-lane road, separated by a median, before and after the intersection. At the intersection, Hwy.; 10 becomes a. four-lane. road (separated by the median), as it has dedicated turning lanes for eastbound and westbound motorists who, are turning left. As the vehicles approached the intersection, |sthe light was red for Hwy. 21 *98 traffic (the ambulance) and green for Hwy. 10 traffic (the Honda).
At approximately the same time, another vehicle was stopped in the left-hand turn lane of eastbound Hwy. 10, waiting to turn left and proceed northbound on Hwy. 21. The type of vehicle stopped in the turn lane is in dispute: Mr. Seal (and his friend, Mr. Ritter, who was following behind the ambulance) testified it was a van; other witnesses (i.e., Lt. Wendall O’Berry) testified that it was a large truck (semi-tractor-trailer), and yet others (i.e., Patricia Allen) maintained it was an 18-wheeler. Notwithstanding the dispute as to the vehicle type, it is undisputed that this vehicle, at least partially, obstructed the ambulance driver’s view of the outer lanes of eastbound traffic on Hwy. 10, and also obstructed the Honda’s view of southbound traffic on Hwy. 21.
A white Nissan driven by Patricia Dawn Allen (Ms. Allen) was stopped in the inside northbound lane of Hwy. 21, directly across the intersection from the approaching ambulance. Ms. Allen testified that she observed the Honda continue through the green light into the intersection and strike the right rear of the ambulance. The force of the impact caused the ambulance to spin out and strike her vehicle.
Also, just prior to the accident, Lieutenant Wendall O’Berry, a police officer of twenty-two years with the Bogalusa Police Department, was operating his vehicle, a pickup truck, in the westbound lane of Hwy. 10, opposite the eastbound travel path of the blue Honda. Lt. O’Berry came to a stop behind another Hwy. 10 westbound vehicle that had also stopped before the intersection, although it had a green light, Lt. O’Berry testified that when he stopped, he heard a siren from an emergency vehicle; and “a moment later,” he observed the ambulance “within a block or so” from the intersection, approaching from the southbound lane on Hwy. 21. He assumed that the driver of the vehicle in front of him had been stopped at the red light, but remained stopped when the light turned green for that same reason. Lt. O’Berry testified that he observed the ambulance slow down, but it did not come to a complete stop at the median before crossing the eastbound lanes of Hwy. 10. Lt. O’Berry watched the ambulance as it came into the intersection, and he saw the Honda strike the right rear of the ambulance. He Instated the impact was “pretty severe” and caused the vehicles to go “into a spin,” and the ambulance struck the white Nissan. He noted that the ambulance was “running code,” and he immediately pulled his vehicle across the median to the other side of the road and called 911 before proceeding to provide assistance at the scene.
Mr. Seal testified that on the date of the accident at issue, December 4, 2008, he was off duty, riding in his personal truck in Bogáíusa with his friend and fellow volunteer WPFD firefighter, Ben Ritter, when they received an emergency Code 3 call by radio and responded that they were on the way. He engaged the tights and sirens on his personal truck and proceeded to drive to the location of the emergency (the Sand-erson home). When they arrived, there were several firemen already there, administering CPR to Mr. Sanderson, who was lying on the floor, unresponsive, not breathing, and without a pulse. Mr. Seal took over giving Mr. Sanderson CPR until the Advanced Care ambulance with the paramedic and EMT (Mr. Freeman) arrived, at which point, he stepped aside to allow them to hook Mr. Sanderson up to the “Lifepak” and continue CPR. Shortly thereafter, Mr. Sanderson was loaded into the back of the ambulance, and Mr. Seal agreed to drive the ambulance to the hospital, so the paramedic and EMT could *99 ride in the back and continue administering CPR to Mr. Sanderson.
According to Mr. Seal, he was travelling approximately 55 mph when he first got on Hwy. 21[3], and as he approached the intersection with Hwy. 10, he gradually slowed the ambulance to 45 mph, to 35 mph, and by the time he reached the intersection, he estimated he had slowed to 10 mph. Mr. Seal testified that the traffic light facing him at the intersection was red, so he came to a complete stop for “a second or maybe two,” and looked ahead, and to his right and his left, to assess the traffic, before proceeding into the intersection. Mr. Seal acknowledged that a police officer and the driver of the white Nissan had both testified that he did not stop; however, he maintained that he did come to a complete stop to assess the traffic before proceeding into the intersection. He Instated that he observed two vehicles on Hwy. 10, westbound, that were both stopped. He also observed a “van” stopped in the eastbound "left-hand turning lane of Hwy. 10, and he also saw a Nissan straight ahead of him, northbound on Hwy. 21 that was also stopped.[4] Mr. Seal stated that as he approached the intersection, he also saw the blue Honda in the eastbound Hwy. 10 lane, but it “was way down the road.” He estimated the Honda was approximately 120 feet away from the intersection and was travelling within the allowable speed limit, at approximately 40-45 mph. When he reached the beginning of the intersection, Mr. Seal testified that he did not see any moving vehicles in or approaching the intersection, so he proceeded forward into the median area of the intersection.
Mr. Seal testified that when he reached the median, he stopped the ambulance a second time. Mr. Seal testified that the van obstructed-hi's view of the Honda he had seen when he approached the intersection initially; however, when he reached and stopped at the median and was trying to inch forward and see around the van, he looked up, saw that the traffic light for his lane had turned green, so he accelerated and proceeded forward. Mr. Seal acknowledged that according to his training, he knew that the Honda had approximately three seconds to reach the intersection (based on his estimate that it was 120 feet away when he first saw it). However, he testified he thought it was safe to proceed when his light' turned green, as he assumed the Honda would stop at the red light facing its lane of travel. Immediately thereafter, the Honda struck the ambulance.
Also testifying at trial as á witness to the accident was Mr. Ritter, a long-time friend of Mr. Seal- and fellow firefighter with the WPFD.' Mr. Ritter was in Mr. Seal’s personal truck in Bogalusa when they received, the emergency call regarding Mr. Sanderson. Mr. Ritter testified that after Mr. Seal was asked to volunteer to drive the ambulance to the hospital, he drove Mr. Seal’s truck, following the ambulance so that Mr. Seal would -have a liaride, after dropping the patient at the hospital and returning the ambulance to the paramedic and EMT. He stated that when the ambulance approached the intersection of Hwy. 21 and Hwy. 10, he was approximately five to six car lengths behind- it, and he observed that .the traffic *100 signal for their lane of travel was red. According to Mr. Ritter, the ambulance stopped at. the red light for a few seconds before entering the intersection. He stated that all other vehicles he observed at the intersection were also stopped, giving the ambulance the right of way, Consistent with the testimony of Mr. Seal, Mr. Ritter stated that Mr. Seal stopped the ambulance again, “momentarily,” after it pulled into the intersection and reached the median. According to Mr. Ritter, by that time, the light for Hwy. 21 traffic turned green. After the ambulance, proceeded forward, past the median and almost through the entire intersection, it was struck by a small car (the blue Honda) heading eastbound on Hwy. 10. Mr. Rit-ter testified that he did not see the Honda until it struck the ambulance. According to Mr. Ritter, upon impact it appeared the ambulance may flip over, but instead, it slid into and struck another vehicle (the white Nissan).
ASSIGNMENT OF ERROR/ISSUES PRESENTED
In his sole assignment of error, Mr. Freeman asserts that “the jury’s verdict was reached in manifest error, as there is no supporting record evidence, and moreover, Defendants admit to safety violations and concede the lack of culpability of the only other vehicle involved in the collision.” Additionally,- Mr. Freeman specifies the following issues as presented for review:
a)Whether there is any record evidence that-can . factually support the jury’s manifestly erroneous verdict, which found that: ⅛
i) Seal “was responding to an emergency call” (even though he admittedly knew Decedent had been non-responsive without a pulse, breathe (sic), or heartbeat for about 55 minutes, and believed Decedent was deceased during that timeframe, including as of the time of the collision);
(ii) “the ambulance’s audible or visual signals were sufficient to warn motorists of its approach” (even though defense expert Charles Prewitt (sic) and Seal both admitted the blue Honda did nothing wrong and there is no record evidence that the blue Honda could or did hear/see any sirens or lights; and
iii) “Richard Seal slowed or stopped the ambulance at the intersection of Highway 10 and 21, as may be necessary for hsthe safe operation of the ambulance and the safety of all persons” (despite Seal’s admitted violation of WPFD # 6[’]s SOP that required him to confirm that the blue Honda would yield before he could proceed through the intersection)?
b) Whether defendant Richard Seal’s admissions of fault and violation of Defendant WPFD # 6’s SOP mandate imposition of liability against. Defendants?
c) Whether Defendants met their burden of proof under La. R.S. 32:125 visa-vis the blue Honda?
DISCUSSION/ANALYSIS
At the outset, we must take issue with the assignment of error, as articulad ed by the plaintiff/appellant, as it is not supported by the record. Specifically, Mr. Freeman contends that the defendants admitted Mr. Seal committed a “safety violation” and that they “coneede[d] the lack of culpability of the only other vehicle” involved in the collision. Our review of the record does not support these contentions.
Mr. Seal admitted that the occurrence of the collision between the ambulance and the Honda evidenced that he did not, prior to entering the second half of the intersection, in fact, ascertain that the Honda was *101 going to yield to the ambulance’s right of way. He also admitted that the WPFD’s internal Emergency Response Policy and the International- Fire Safety Training As- • sociatioris Manual state that he “shall be certain that the right of way has been yielded” before proceeding through the intersection.[5] However, Mr. Seal maintained that he expected that the Honda would stop as required when the light facing it turned red. Further, Mr. Seal testified that the requirements of state law trump any |14other policy or guidelines, and stated that his actions comported with state law requirements.
Daniel Touchstone, the assistant chief of the WPFD (Mr. Seal’s supervisor) and a certified EMT, also testified that anything other than the statutory requirements, such as the internal policies of the WPFD and other national and international manuals are simply guidelines and not absolute requirements. Mr. Touchstone also corroborated Mr. Seal’s testimony that state law trumps the department’s internal procedures and the national and international manuals and guidelines. Although Mr. Touchstone did acknowledge that the best course of action is for a driver of an emergency vehicle to “expect the unexpected” and not assume another vehicle’s actions, we do not find that this statement, alone, gives rise to any purported “admission” by the defendants that Mr. Seal 'violated safety standards and was liable for causing the accident.
Additionally, our review of the record reveals that the defendants did not concede that the: driver-of the* Honda lacked culpability. Appellant’s repeated citation to Mr. Seal’s testimony that the Honda was not “doing anything wrong” is taken out of context. First, the question .was posed to Mr. Seal in-the context of the speed at which the Honda was travelling. He responded that as far he.could tell, the Honda was not exceeding the speed limit for its lane of travel. Immediately thereafter, Mr. Seal was asked, “[s]o he wasn’t doing anything wrong?” Mr. Seal responded “[n]ot that I’m aware of.” We find,, when placed in context, it was clear that Mr. Seal was referring to the speed at which the Honda was travelling. . Moreover, Mr. Seal testified that his .traffic light, although red when he initially approached the intersection, turned green by the time he reached the median and was inching forward to proceed across the eastbound lanes of Hwy. 10. He further testified that his light turning green indicated to him that the light for any Hwy. Í0 eastbound traffic had turñéd red, and that he fully expected the Honda would obey that red light and stop, instead of continuing through the intersection.' Thus, the record does not support the appellant’s contention that Mr. Seal admitted that the Honda driver lacked culpability in causing the accident. .
hfiFinally, our review of the record does not support appellant’s contention that Mr. Seal admitted that he operated the ambulance with reckless disregard for safety *102 when he testified that he “hit the gas” and “accelerate[ ] through the intersection” because he wrongly assumed he could beat the Honda. Again, appellant takes a small portion of testimony out of context. Taken as a whole, Mr. Seal’s testimony did not establish, as appellant contends, that he decided “to try and beat the Honda through the intersection.” Mr. Seal stated that he began inching forward when he reached the median of the intersection, in attempts to see if any vehicles were approaching from the eastbound lanes of Hwy. 10, but that, when the traffic light facing him turned green, he accelerated and proceeded to cross those lanes of the intersection. He further stated that he thought he could make it safely through the intersection because the corresponding light for the Honda turned red, and he assumed the Honda would obey the traffic signal and come to a stop.
The appellant maintains there are “no pivotal credibility determinations at issue.” Again, we find the record reveals otherwise, In fact, some of the most significant factors .regarding the propriety of Mr. Seal’s actions in operating the ambulance are in dispute, and subject to the jury’s credibility determinations.
First, whether Mr. Seal slowed or stopped at the median in the intersection before crossing the eastbound lanes of Hwy. 10 is disputed. Mr. Seal testified that he did stop, and then inched forward in an effort to see any approaching traffic. Mr. Ritter, who was behind the ambulance and witnessed the entire incident, also testified that Mr. Seal stopped, both before entering the intersection, and again, before proceeding in the intersection past the median. On the other hand, Lt. O’Berry and Ms. Allen both testified that he did not stop a second time when he reached the median. Additionally, Mr. Touchstone testified that, pursuant to statutory law (i.e., La. R.S. 32:24), an emergency vehicle responding to an emergency is allowed to exceed the speed limit, and does not have to come to a complete stop at red lights or intersections, but, rather, is only required to slow down.
JjjSecondly, whether Mr. Seal had a green or red traffic signal at the time that he pi'oceeded through the intersection is a fact disputed by the evidence. Mr. Seal testified that his lane of travel had a red light approaching the intersection, but that the light turned green while he was inching forward at the median. Lt. O’Berry testified that when the ambulance initially approached the intersection, it had a red light (because he, O’Berry, had a green light). However, Lt. O’Berry further testified that once he saw the ambulance, he was watching the ambulance instead of the lights, so he could not say what color the traffic signal was once the ambulance entered the intersection. Ms. Allen maintained that she (and the ambulance) had a red light, until after the collision.
Finally, the estimated speed of the ambulance at the point of impact was also disputed by the witnesses. At trial, Mr. Seal testified that he was travelling either 3-4 mph; however, he acknowledged that he had previously estimated his speed was 10-15 mph. Lt. O’Berry estimated the ambulance was travelling 20 mph. Ms. Allen testified that the ambulance slowed down “but not much,” then it kept going. Plaintiffs expert in accident reconstruction, Dr. Oscar F. Griffith, estimated the ambulance’s speed at 15 mph; and the defendant’s expert in accident reconstruction, Mr. Charles Pruitt, estimated the ambulance’s speed at 14 mph.
Thus, contrary to appellant’s claim, there are several facts critical to a determination of liability in causing this accident that were disputed by the evidence, and required credibility determinations by *103 the trier of fact. As a court of review, we cannot overturn these determinations as long as there is a factual basis in the record to support them. The jury in this case made those credibility determinations and concluded that Mr. Seal did not act in a reckless disregard for the safety of others. Because there is a factual basis in the record to support this conclusion, we cannot overturn it, even if we think we may have believed other witnesses and concluded otherwise.
Accordingly, we discuss and resolve the issues raised by appellant’s assignment of error, but only insofar as he asserts the jury’s verdict was manifest error; i.e., we needjjjonly determine whether there is a reasonable factual basis in the record to support the verdict.[6]
First, we address the appellant’s contention that there is no evidence in the record to support the jury’s finding that Mr. Seal was responding to an emergency call, even though he admitted that Mr. Sanderson had been non-responsive, without a pulse or heartbeat and not breathing for approximately fifty-five minutes, and even though Mr. Seal believed Mr. Sander-son might have already been deceased as of the time of the collision. This fact is significant, because La. R.S. 32:24 applies (and grants certain privileges) to drivers of an authorized emergency vehicle when responding to an emergency call. The evidence in the record contains ample evidence to support the jury’s finding that Mr. Seal was responding to an emergency call.
It is undisputed that the radio call to which Mr. Seal and Mr. Ritter responded was a Code 3 medical emergency. The record reveals that a Code 3 is the most serious level of emergency, and responding vehicles are required to engage both their emergency lights and sirens. It is also undisputed that the ambulance involved in this matter had its lights and sirens engaged as required. Mr. Seal testified that once a driver of an emergency vehicle begins driving under a Code 3, he is required to continue at that level of responding until he is specifically advised by a higher authority that the code could either be reduced or stopped. He admitted that he was of the belief that Mr. Sanderson may have already died, given that he was unresponsive at his home and when they placed him in the ambulance. However, he stated.that did not give him any authority to downgrade the emergency code under which he was required to proceed. According to Mr. Seal, that authority had to come from someone higher in authority. He stated that 1 iScould be the paramedic in the back of the ambulance, but also indicated that “it would probably have to' be somebody higher than that.”
Mr. Seal’s friend and fellow volunteer firefighter, Mr. Ritter, corroborated Mr. Seal’s account of the requirements of a Code 3 response. Mr. Ritter further testified that in order to discontinue CPR, a physician’s directive is required, and that only EMT’s have the authority to call a hospital to obtain that directive and a discontinuance of the Code 3 requirements. Mr. Touchstone also testified that the driver in a Code 3 response has a duty to *104 actívate the lights and sirens, and they are to stay on at all times until the ultimate destination is reached or until instructed by an officer or someone “above” that it can be dropped to a lesser code. Mr. Touchstone stated that the only time a driver has the authority to change the code is in the event of such bad weather that the driver prefers to turn off the lights and slow the vehicle rather than “risking still going at the speed of Code 3 and putting their life or somebody else’s life in jeopardy” due to heavy “rain or fog.”
The plaintiff, Mr. Freeman, also confirmed that the ambulance was; and at all times remained under a Code 3 response, since he and the paramedic were continuing resuscitation efforts ón Mr. Sanderson in the back of the ambulance. He further corroborated the testimony that even when a transported patient is believed to have already died, the volunteer operator of an ambulance has no authority to change the code level of the response.
There.is no evidence whatsoever in the record that the Code 3 was ever .changed during the course of the response in this matter. Indeed, it is undisputed that the paramedic and EMT in this case continued resuscitation efforts and giving Mr. Sand-erson CPR in the back of the ambulance while it was in route to the hospital. Appellant does not cite any authority, nor is there any basis in the record, for his contention that simply because Mr. Seal believed his passenger may have already died, then the response was no longer an emergency. In fact, the evidence established that once a call is deemed a Code 3, it remains an emergency call until and if someone with authority, downgrades or .suspends the emergency. Until then, Mr. Seal, as the driver of the emergency vehicle, was required to proceed-under the Code 3 level of emergency.’ Thus, there is no error in 119the jury’s conclusion that Mr. Seal was responding to an emergency call; and based on that conclusion, La. R.S. 34:24 and the privileges- allowed thereby, are applicable herein.
' The next issue raised by appellant to support his assignment of error is whether the “ambulance’s audible or visual signals were sufficient to warn motorists of its approach.” In connection therewith, appellant also alleges that the evidence established that Mr. Seal was not trained to operate an ambulance, specifically, suggesting some liability on the, part of the WPFD for allowing its volunteer firefighter to operate an ambulance when needed.
Mr. Seal testified that he became a junior firefighter for WPFD in September 2001, when he was fifteen years old. At the age of eighteen, he was trained to operate fire emergency vehicles, beginning with a “brush truck” (that was used to fight brush fires) and a service truck. By the time he turned twenty-one (in 2007), he had been trained and was authorized to drive all emergency vehicles in the fire department, and did so in emergency situations on a regular basis. Although he was not specifically trained to drive an ambulance in the transport of a medical emergency, he stated that he was specifically trained to operate a fire truck, and other than the fact that the smaller size of an ambulance made it easier to operate, there are no essential differences. in the operation of emergency vehicles. He testified that he also had medical life support training, including administering CPR. Mr. Seal’s testimony regarding his training to operate emergency vehicles was corroborated by Mr. Touchstone. He testified that the training Mr. Seal received for operating fire trucks applied equally to the operation of police'cars and ambulances, stating that “nothing differs” because the training for operating any emergency vehicle is “all the same.”
*105 Mr. Seal testified that prior to the accident at issue, he had driven an ambulance several times (“ten to twelve, if not more”) in a Code 3 situation under similar circumstances — when the paramedics responding to an emergency needed to continue to render medical support to a person in route to a hospital and needed a volunteer to drive the ambulance. He testified that he had driven a fire truck in an emergency and in Code 3 situations many times, unable to give a definite number of times, but stating it Igpwas “up there.” He further testified that prior to December 4, 2008, he had never been in an accident while operating any emergency vehicle.
The record established without dispute that the ambulance, at all times, was operated with its emergency lights and sirens engaged. All of the other drivers of vehicles, in or near the intersection testified that they both saw and heard the ambulance and had stopped to yield the right of way. There is also evidence, albeit disputed, that the Honda’s lane of travel was faced with a red light immediately prior- to the collision. The record leaves unanswered why the Honda proceeded through the intersection, or whether its driver either heard or saw the ambulance prior to the impact. However, contrary to appellant’s contention, there is a .sufficient and reasonable factual basis to support the jury’s finding that the ambulance’s use of its visual and- audible signals were sufficient to warn motorists of its approach. We also note that appellant has not suggested, nor does the record, bear out any other alternative method by which the ambulance could warn motorists of its approach that would have been more adequate or effective at accomplishing this goal than to have both its lights and sirens engaged. Accordingly, we find no merit in these arguments.
Finally, the appellant , contends there is no evidence in the record to factually support the finding implicit in the jury’s verdict, that Mr. Seal slowed or stopped the ambulance at the intersection of Hwys. 10 and 21, as is necessary for the safe operation of the ambulance and of all persons. As noted several times herein, the evidence concerning whether Mr. Seal slowed down or came to a complete stop is in 'dispute; thus, that is a factual finding dependent on the jury’s credibility determinations. Moreover, there is no dispute that the' .ambulance either slowed or stopped;- there is no evidence that the ambulance just proceeded thro.ugh the intersection without any regard for safety. Thus, whatever factual findings reached by the jury in concluding that Mr. Seal did not operate with reckless disregard for safety are supported by a reasonable factual basis in the ’ record, and the jury’s findings are not ihanifest error.
^CONCLUSION
For all the foregoing reasons, the record contains ample and reasonable factual support for the jury’s verdict, such that it is not manifestly erroneous. Much of the factual basis for the imposition of liability on Mr. Seal in this matter was in dispute, and the jury’s findings, although different than what we may have concluded,' cannot be overturned as long as that reasonable factual basis in the record exists. Accordingly, the judgment adopting the jury’s verdict, finding Mr. Seal did not act with reckless disregard for safety in his operation of the, ambulance, and dismissing Mr. Freeman’s claims against Mr. Seal, the WPFD, and its insurer, AAIC, is affirmed. All costs .associated, with this appeal are assessed to the plaintiff, Jeremy Freeman.
AFFIRMED.

. A Code 3 call Is the highest emergency code and requires that all responding emergency vehicles have the audible and visual warning signals (sirens, and lights) in operation at all times during the course of the emergency.

. Mr. Seal admitted that he had never been specifically trained in the operation of an ambulance in transporting medical patients; however, he testified that there is not that much difference in the rules and regulations applicable to driving emergency vehicles, and indeed, that the operation of fire trucks, in which he was specifically trained, is actually more difficult and complex. Moreover, he testified that he had previously driven ambulances in Code 3 classified emergencies on approximately ten to twelve separate occasions.

. Mr. Seal admitted that he was travelling approximately 5 mph over the speed limit, as state law permitted emergency vehicles to travel an additional five to ten mph when responding to an emergency under a Code 3.

. Mr. Seal acknowledged • a . discrepancy among the witnesses as to the type of vehicle stopped in the left turning lane; however, he insisted it was a van, and not an eighteen-wheeler orlarger truck.

. WPFD Emergency Response Policy, which was entered into evidence at trial, provides, in pertinent part:
Responsibility for Vehicle Operation
It is the apparatus operator[’]s responsibility to maintain control of the vehicle at all times. He/She shall have a working knowledge of this standard and be qualified as to fire department guidelines to operate the apparatus.
When responding under emergency conditions, the operator shall exercise due regard for the safety of the crew, the apparatus!!,] and the general public. He/She shall be certain that the right of way has been yielded before proceeding through any controlled intersections....
(Emphasis added.)

. We also find no merit in appellant’s argument in brief that the defendants "absolutely failed to shoulder their burden of proving, under La. R.S. 32:125, any degree of fault on the part of the blue Honda." The defendants had no such burden of proof. The issue presented in this matter was whether Mr. Seal operated the ambulance with reckless disregard for the safety of others. That burden of proof rested with the plaintiff. The jury found that Mr. Seal did not act with reckless disregard in his operation of the ambulance, and its inquiry ended there.